Case No. 5:15−cv−01672−ODW

---

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

Raymond Newberry, et al.,
Plaintiffs-Appellants,

vs.

City of San Bernardino, et al.,
Defendants-Appellees.

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

---

Appeal from the Judgment of the United States Bankruptcy Court
For the Central District of California
The Hon. Meredith A. Jury
B.C. Case No.: 6:12−bk−28006−MJ

---

Marjorie Barrios, SBN: 242159
Law Offices of Marjorie Barrios
P.O. Box 500
San Bernardino, CA 92402
Tel.:     (909) 888-6000
Fax:      (909) 888-6001
E-mail:   mbarrios@mbarrios.com
Counsel for Plaintiffs/Appellants
Raymond Newberry, et al.

Contents

STATEMENT OF JURISDICTION ...................................................................7

STATEMENT OF ISSUES ..............................................................................8

STATEMENT OF THE CASE ..........................................................................8

STATEMENT OF FACTS…………………………………………………9

SUMMARY OF ARGUMENT.......................................................................12

STANDARD OF REVIEW ............................................................................14

ARGUMENT.................................................................................................14

I. THE AUTOMATIC STAY PROVISIONS DO NOT COVER ACTS OF A

DEBTOR MUNICIPALITY THAT ARE INTENTIONAL VIOLATIONS OF

CIVIL RIGHTS COMMITTED POST-PETITION...............................................14

    A.     THE CITY COMMITTED AN INTENTIONAL VIOLATION OF

RIGHTS AGAINST ITS CITIZENS POST-PETITION ........................................15

    B.     THE PRACTICE – DRAGNET SEARCHES WITH INSPECTION

WARRANTS .................................................................................................15

    C.     THE TORT WAS INTENTIONAL .......................................................17

    D.     THE BANKRUPTCY STAY ...............................................................18

         1.   THE STAY AND DISCHARGE.............................................18

         2.    BANKRUPTCY LAW WAS NOT ENACTED TO PROTECT

ROGUE MUNICIPALITIES ..............................................................................21

3.   SECTION 109 (c)(4) DOES NOT GRANT PROTECTION FOR DEBTORS WHO USE A FILING FOR REASONS OTHER THAN REORGANIZATION ..................................................................21

4.   11 U.S.C. § 921(c)  PROHIBITS BAD FAITH FILING ......22

5.   FAIRNESS PROVISION OF BANKRUPTCY CODE 1129(a)(3)..............................................................................23

6.   *READING* ANALYSIS..................................................25

II. THE STAY PROVISION DOES NOT APPLY TO DECLARATORY AND INJUNCTIVE RIGHTS UNDER 28 U.S.C. § 2201................................................26

A.   COMPLAINTS FOR INJUNCTIVE RELIEF DO NOT VIOLATE THE STAY PROVISIONS..................................................................27

B.   THE AUTOMATIC STAY PROVISIONS DO NOT APPLY TO AWARDS FOR ATTORNEYS' FEES UNDER 42 U.S.C. § 1988 ...................27

III. APPLICATION OF THE STAY VIOLATES THE FIRST AMENDMENT RIGHTS OF THE APPELLANTS................................................................30

IV. THE COURT ERRED IN WEIGHING THE CURTIS FACTORS ...............31

A.   THE *CURTIS* FACTORS .....................................................31

B.   THE NATURE OF APPELLANTS' INTEREST .....................................32

C.   THE NATURE OF THE CITY'S INTEREST.........................................34

D.   THE INTEREST OF THE APPELLANTS IN LIVING FREE FROM OPPRESSION OUTWEIGHS ANY OF THE CITY'S INTERESTS...............35

V.  CONCLUSION.................................................................35

Cases

*AAA v. Oakhurst Lodge*,   2012 U.S. Dist. LEXIS 179753 . . . . . . . . . . . . . . 27

*Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d

    518 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Andresen v. Maryland* (1976) 427 U.S. 463. . . . . . . . . . . . . . . . . . . 16

*Ault v. Emblem Corp. (In re Wolf Creek Valley Metro. Dist. No. IV)*, 138 B.R. 610,

    618-19 (D. Colo. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Citibank (S.D.), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir. 1996).*

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Farms v. Gen. Teamsters, Warehousemen & Helpers Union, Local 890 (In re Gen.*

    *Teamsters, Warehousemen & Helpers Union, Local 890)*, 265 F.3d 869, 877 (9th

    Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) . . . . . . . . . . . . . . . . . . 29

In *re Landmark Fence Co., 2011* U.S.   Dist. LEXIS 150928, 10 (C.D. Cal. 2011)

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999) . . . 23

*In re Pacific-Atlantic Trading Co*., 64 F.3d 1292, 1302 (9th Cir. 1995) . . . . . . 20

*In re Pierce County Hous. Auth.*, 414 B.R. 702, 719-720. (Bankr. W.D. Wash.

    2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Plumberex Specialty Prods., Inc.*, 311 B.R. 551, 559 (Bankr. C.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kaufman County Levee Imp. Dist. No. 4 v. Mitchell*, 116 F.2d 959, 960 (5th Cir.1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kawaauhau v. Geiger*, 523 U.S. 57, 63, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998) 19

*Magana v. Moore Development Corp. (In re Moore)*, 1 B.R. 52, 54 (Bankr. C.D. Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reading v. Brown* (1968), 391 U.S. 471; 88 S. Ct. 1759; 20 L. Ed. 2d 751 . . . . 25

*Ryan v. Loui* (*In re Corey*), 892 F.2d 829, 835 (9th Cir. 1989) . . . . . . . . . . . 24

*Town of Belleair v. Groves*, 132 F.2d 542, 543 (5th Cir. 1942) . . . . . . . . . . . 23

*Wilson v. Layne*, 526 U.S. 603; 119 S. Ct. 1692; 143 L. Ed. 2d 818 (1999)........12

*United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) . . . . . . . . . . . . . 16

*United States v. Jones*, 132 S. Ct. 945 (2012) . . . . . . . . . . . . . . . . . . . . . 34

*United States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir. 1984) . . . . . . . . . 16

**Statutes**

11 U.S.C. § 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11 U.S.C. § 362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11 U.S.C. § 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11 U.S.C. § 727 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11 U.S.C. § 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11 U.S.C. § 944 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11 U.S.C. § 921(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 2710 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

California *Code of Civil Procedure* § 1822.56 . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

California *Code of Civil Procedure* § 1822.50 . . . . . . . . . . . . . . . . . . . . 15

California *Penal Code* § 1523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Other Authorities**

H.R. Conf. Rpt. 94-938 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H.R.Rep. No. 94-1558 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2 Collier on Bankruptcy ¶ 921.04[2]. (Henry J. Sommer & Alan N. Resnick eds.
    16th ed. 2011.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

H.R. Rpt. No. 94-686 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Rules**

Fed. R. App. P. 32(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed. R. App. P. 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**INTRODUCTION**

On August 19, 2014, the City of San Bernardino, County of San Bernardino Probation Department Officers, California Parole Officers and County of San Bernardino Child Protective Services descended on Edgehill Apartment complex in San Bernardino. ER 346-347.  No notice was given prior to arrival.  *Id.*  Armed policemen knocked on the door and ordered the occupants out of their homes.  ER 485:18-20.  San Bernardino Police and/or County Probation Officers – who are not POST certified then entered the apartments going room to room looking for people in the homes.  This was done with weapons drawn.  If a unit was vacant, the police and probation gained entry through a pass key provided by the manager. ER 487:18-488:25.  Had someone been home asleep the confrontation could have been fatal.

After the occupants were evicted from their homes a host of government agents were on scene.  Child Protective Services reviewed everyone and would have been required by law to report signs of abuse.  "The mission of the San Bernardino Police Department/ Code Enforcement will be to enter each individual unit to identify any and all violations. Officers will attempt to identify all parties living or visiting the complex at the time of the warrant[1]." ER 490, ER 492: Briefing Packet.  Probation took names, demanded identification and made lists of who lived at the apartments.  ER486:14-487:7.

---

[1] This alone indicates this is a criminal search warrant.  Visitors and occupants would all be detained and searched for criminal activity.  This is constitutionally obnoxious.

The raid became public because San Bernardino hired a media relations firm to publicize it.   ER 328.   The City, County Probation, State Parole, Child Protective Services and a host of other agencies had performed two similar raids in the past year and a half searching entire complexes with one inspection warrant. ER 512:6-513:9.   The City felt its efforts were being hidden under a bushel and needed to be known.   The City invited Ryan Hagen of the San Bernardino Sun Newspaper to the raid.   ER 327-330.   Appellant, Patricia Mendoza, woke the next morning to find her picture in the local newspaper in her own kitchen with law enforcement searching her home.   ER 344.   The Chief of Police of San Bernardino went on the Los Angeles news and stated of the Appellants' homes:

> Officers that are working the streets know that those poor apartment complexes, so to speak, those places that none of us would necessarily want to live because of the condition of them and because of the way that they're maintained, tend to be kind of a harboring place for crime.  ER 391.

The City Attorney echoed this belief: "These properties are essentially crime pockets waiting to happen." *Id*.

Appellants believe that they do not live in "crime pockets waiting to happen" and that they live in homes protected by the Fourth Amendment.  The following day they went back to their jobs and their lives.  But a few stood up and demanded that the sweeps stop.  A few demanded that their Fourth Amendment rights be honored – even if they had the misfortune of being poor.  That is what started this odyssey.

### STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

**STATEMENT OF ISSUES**

1.      Do the automatic stay provisions of 11 U.S.C. §§ 362 and 922 of the Bankruptcy Code protect a municipal debtor from suit if it commits an intentional tort against its citizens?

2.      Does granting an automatic stay to a municipal debtor who commits an intentional tort against its citizens violate citizens' First Amendment rights to petition the government?

3.      Do the automatic stay provisions of the Bankruptcy Code vitiate 28 U.S.C. § 2201—the right to injunctive and declaratory relief?  Are attorneys' fees requests under 42 U.S.C. § 1988, claims against a municipality or necessary expenses?

4.      Did the Court err in applying the facts of this case to the *Curtis* factors in weighing the balance of harms between the City and its citizens?

**STATEMENT OF THE CASE**

The City of San Bernardino filed bankruptcy on August 1, 2012.  On August 19, 2014, the search giving rise to the District Court action occurred.  On November 14, 2014, Appellants filed suit against the City in United States District Court, Case No.: EDCV 14-02298 JGB (SPx).  On December 3, 2014, the Honorable Jesus G. Bernal issued an order that the stay prevented the case from proceeding against the City of San Bernardino.

On February 4, 2015, Appellants filed a motion for relief from stay before the Honorable Meredith A. Jury.  That motion was denied, conditionally, without prejudice.  The denial was conditioned upon the parties working out a stipulation,

that would become an order, that the City would not enter the Edgehill Apartment complex, and the Appellants' homes on an inspection warrant without seeking prior consent.   The parties could not reach an agreeable stipulation and returned to court.

On August 25, 2015, the Court denied the request for relief from stay with the order that the City would not enter the homes of the Appellants, or Edgehill Apartment complex, on an inspection warrant without first seeking consent.  If Appellants were to move they would need to inform the City Attorney's office where they were moving to receive the protection of the order.  The order was silent on what protection the Appellants might receive if they were to be overnight guests and made no ruling on the constitutionality of the City's actions.  At the close of litigation the City maintained its actions were correct and the Appellants maintained the City had engaged in an unconstitutional scheme.  That is what triggered this appeal.

## STATEMENT OF FACTS

The City filed bankruptcy on August 1, 2012.  In February of 2014, a new mayor Carey Davis, and a new City Attorney, Gary Saenz, were voted into office. Mayor Davis came up with a program to get tough on crime.  ER 314.

In August of 2014, it was implemented.   On August 19, 2014, San Bernardino City Police, County Probation, Code Enforcement, Child Protective Services and numerous other government agencies descended on the Edgehill Apartment complex and searched every unit.  Media was "invited" into the search. ER 327-330.  The reporter, Ryan Hagen, tweeted out live pictures of the interior of

apartments to the waiting world.  ER 389.  Pictures were taken by media and posted in newspaper articles the next day.  Television spots were aired. ER 391 and lodged exhibit.  Pictures taken from the search were broadcast on the evening news. *Id*. No consent was given by anyone to these publications.  Facebook posts were placed, with pictures from the raid, onto the pages of the Chief of Police and the City Mayor[2].  ER 346-347, ER 353-354.

The Chief of Police went on live television, and Facebook, to announce the raid.  His words are chilling:

> With more than 50 percent of our single and multi-unit housing comprised of rentals, we won't be able to change the city overnight but we will focus on three area "hot spots" that feature a combination of multi-unit rentals, high calls for police service, and crime occurring in the general area. This will allow us to change entire neighborhoods and remove the bad element. ER 346-347

The City Attorney referred to the Appellants' homes as "crime pockets waiting to happen".  ER 391.

The City searched over forty apartments occupied by over one-hundred people.  The inspection warrant that the City believed provided them a fig leaf, took one hour of legal time to draft.  ER 387.

---

[2] Eileen Hards, a PR specialist, includes the publication of the raid on her resume. She notes that the story created "over 1,474,768 impressions" and "[w]e also boosted the post with a small budget to increase the reach of the message."  It may be found on the web at http://www.eileenhards.com/#!the-pr-kid/ctzx.

The Chief of Police and Mayor's posting of pictures of the Appellants' homes outraged the Appellants to the point of filing for a temporary restraining order.  The City's response is telling.  The Mayor refused to remove the posts.

> The mayor and the rest of the city right now is trying to target landlords who live out of the city and don't maintain and care for the properties that our lower income residents live at.  In an effort to further that mission, the mayor is wanting to target the property owners and feels it necessary to keep that post up at this time, your Honor.   Lauren Daniels, Deputy City Attorney.  ER 364:11-17

The reason the City believed it could leave the posts up, and violate rights of citizens without fear of court intervention, was the bankruptcy stay for post-petition acts.

> In response to that, your Honor, I would like to draw the Court's attention we have had post-petition cases filed that came up on appeal -- I'm sorry for relief from stay.  The bankruptcy court did hold those post-petition claims were subject to the automatic stay.  Essentially, what it turns on is -- and I believe you previously stated that the BK court has held the stay does apply to post-petition claims where the case would be an encumbrance or burden on the attempts of the debtor to reorganize and the essential administration of the estate.   The City's position is the stay is in effect, and Ms. Barrios needs to apply for relief before being heard on the TRO, because she has requested attorney's fees and exemplary damages.  I'm sure she's not doing this TRO for free.  Jason Ewert, Deputy City Attorney.  ER 369:10-23.

The City, to this day maintains it did nothing wrong.  An unconstitutional policy was enacted and the City believes the automatic stay protects it.

# INTRODUCTION

## SUMMARY OF ARGUMENT

The City of San Bernardino committed the unthinkable. It willfully and intentionally, violated its citizens' rights. The search that forms the basis of this appeal was publicized, well thought out, and it was known to be a violation of Fourth Amendment rights. A print reporter accompanied the police and tweeted out live pictures of the search. This was known to be a violation under *Wilson v. Layne*, 526 U.S. 603; 119 S. Ct. 1692; 143 L. Ed. 2d 818 (1999), which prohibits ride-alongs of media while police serve warrants.

But what makes this event remarkable is that the City coldly calculated it could sweep the violations of rights under the rug by relying on the bankruptcy stay to immunize it from suit and then to discharge the damages. This makes this case a *sui generis*.

Appellants make three arguments. First, that the automatic bankruptcy stay of 11 U.S.C. §§362 and 922 simply do not protect a City from suit where it commits an intentional tort, post-petition violation of its citizens' rights. Appellants will candidly admit they cannot cite to a single statutory provision that makes the stay provisions inapplicable to intentional post-petition torts. However, a review of the Bankruptcy Code's provisions as a whole reveals Congress never intended to have the stay provisions or discharge provisions to function as a cover for unconstitutional policies. The presence of several gatekeeping provisions evidences this assertion. Congress, in the modern era, has never enacted a law that allows any governmental agency to purposefully violate civil rights. Congress,

logically, never anticipated that a municipality would use the stay provisions to violate rights.  Should this interpretation prevail the entire action should proceed.

Secondary is the assertion that 28 U.S.C. § 2801, allowing for declaratory and injunctive relief, is not the type of action that is stayed by the automatic stay provisions.  Injunctive and declaratory relief are not actions that take property as contemplated under 11 U.S.C. § 362.  As a corollary, the attorneys' fees provisions of 42 U.S.C. § 1988 are not a claim against the debtor, but a necessary cost of operating the debtor.  The argument for this is that Congress explicitly stated 42 U.S.C. § 1988 attorneys' fees awards are assessed as "costs" not as damages.  If a debtor municipality maintains an unconstitutional policy, it cannot avoid the cost of the policy in bankruptcy any more than it can avoid paying any other necessary expense of a municipality.

Should the Court find that Appellants' argument is unavailing under the statutory provisions of the *Code*, the Appellants assert that if the *Code* allows for an intentional violation of civil rights by a debtor municipality and prohibits any court action to declare or enjoin that policy under 28 U.S.C. § 2801 then those provisions of the *Code* are unconstitutional as applied.  That is, the bankruptcy code would intrude upon Appellants' First Amendment rights to petition the government.

The third argument is that the Court in applying the *Curtis* factors, failed to gauge the weighing of the harms.  Simply put, the constitutional rights of citizens to be free from governmental oppression outweigh any interest a debtor

municipality has in violating those rights – convenience, political expediency, reorganization.

## STANDARD OF REVIEW

The Court's findings of law are reviewed *de novo*, questions of fact are reviewed under the clear error standard. *Citibank (S.D.), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1086 (9th Cir. 1996*).* For a factual finding to fall under the rubric of clear error, if a reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985).

Decisions to lift the stay are reviewed under the abuse of discretion standard. *In re Nat'l Envtl. Waste Corp.,* 129 F.3d 1052, 1054 (9th Cir. 1997) (citing *Mataya v. Kissinger* (*In re Kissinger*), 72 F.3d 107, 108 (9th Cir. 1995).

The appeal does not seek review of factual questions, instead, as presented above, it asks for review of legal conclusions.

## ARGUMENT

### I.  THE AUTOMATIC STAY PROVISIONS DO NOT COVER ACTS OF A DEBTOR MUNICIPALITY THAT ARE INTENTIONAL VIOLATIONS OF CIVIL RIGHTS COMMITTED POST-PETITION

The City committed intentional, post-petition acts that amounted to a violation of the Fourth Amendment. One inspection warrant was used to conduct a "no notice" inspection of the Appellants' homes and an entire complex. The

expedition was really a hunt for criminal activity and violated every known norm of reasonable governmental behavior.

## A. THE CITY COMMITTED AN INTENTIONAL VIOLATION OF RIGHTS AGAINST ITS CITIZENS POST PETITION

The City of San Bernardino committed unprecedented acts. While under the auspices of an automatic stay, the City intentionally and systemically violated the Fourth Amendment rights of its citizens. The City engaged in sweeps of entire apartment complexes with one inspection warrant. Diligent search has been made by counsel and no similar fact pattern has ever been found in municipal bankruptcy. Quite probably because it was unthinkable to Congress that a government could act as oppressor to its people.

## B. THE PRACTICE – DRAGNET SEARCHES WITH INSPECTION WARRANTS

The City had in place a scheme to search entire complexes with one inspection warrant. No effort was made to particularize which apartments needed inspection, or to notify people they were coming. In fact, the City worked with the County an]d the State to make sure what was garbed as an inspection was a search for criminal activity.

The warrant itself tells it is a search warrant. It is directed to peace officers and code officers. ER 356: 10-12. A warrant directed to a peace officer is a search warrant under California law.

California *Code of Civil Procedure* §1822.50, defines an inspection warrant:

An inspection warrant is an order, in writing, in the name of the people, signed by a judge of a court of record, directed to a state or local official,

commanding him to conduct any inspection required or authorized by state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning.

A search warrant is defined in California *Penal Code* §1523 as:

[A]n order in writing . . .  signed by a magistrate, directed to a peace officer, commanding him or her to search for a person or persons, a thing or things, or personal property . . . .

The search was a criminal search looking for people, including visitors, and compiling lists of who lived in the area.  ER 490, ER ER486:14-487:7.  The comments of the Chief of Police and City Attorney evidence this.  The warrant was purposefully confrontational with "no notice" being given as is required under California law.  *See* §1822.56 of the California *Code of Civil Procedure*.  Equally, under federal law, the lack of probable cause and the fact that the search was for criminal activity makes the search unconstitutional.  *See United States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir. 1984) ("[G]eneral warrants are prohibited."; *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) ("Nothing is left to the discretion of the officer executing the warrant."  A general warrant offends the Fourth Amendment in part because it leaves too much "'to the discretion of the officer executing the warrant.'"  *Andresen v. Maryland* 427 U.S. 463, 480 (1976).  This warrant left the authorities to have a field day.  And if there is any way that the City can justify bringing agencies like Probation in for an

inspection warrant it eludes Appellants and logic.  This was to be a sweep of a minority neighborhood.

## C. THE TORT WAS INTENTIONAL

Courts have faced cases where a municipality commits unintentional torts post-petition.  In this case, the policy or practice was willful.  The City Attorney and Chief of Police announced it on television.  What is truly corrosive about the policy is that the neighborhoods where the searches took place were largely minority.  Police relations and community trust are important in effective law enforcement.  Good men and women sacrifice much to be peace officers and foster trust in communities.  The raid that took place in a minority community obliterates that trust and brings disrepute on the men and women who are dedicated peace officers and spend lives making society safer the right way.  The City's scheme did nothing to reduce crime and caused much harm.

The City after getting a bankruptcy stay reprieve intentionally violated its citizens' rights.  Now the City asserts that it cannot be sued because of the stay and that it can discharge any claims that result from the raids.

If municipalities can intentionally violate citizens' rights and walk away without consequence it bodes poorly for the citizenry.  It is not hard to imagine, had this interpretation of the law existed in the 1960s certain cities in the South – and elsewhere – would have used a bankruptcy filing to cloak racially repugnant schemes.  Race, overtly, did not motivate the City's scheme; however, the effect was felt disproportionately by minority citizens.  It is inimical to an ordered society that a City can intentionally violate fundamental rights.

### D. THE BANKRUPTCY STAY

### 1.  THE STAY AND DISCHARGE

Appellants challenge the application of stay found under 11 U.S.C. § 362. Section 362 is incorporated into chapter 9 proceedings. 11 U.S.C. § 901(a).   The stay "operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case." 11 U.S.C. § 362(a)(1).

The purpose of the stay, however, is to grant a municipality breathing room to reorganize.  It is not to defeat the rights of citizens.

Appellants allege an intentional violation of civil rights by the City, specifically, their Fourth and Fourteenth Amendment rights.  The City maintains that the stay prevents all suits and allows discharge of any claims from its citizens for violations of their rights.

The quirks of Chapter 9 bankruptcy laws seem to indicate there is a statutory basis for this argument – if we ignore the fact that Congress could not intend to countenance violation of rights found in the Constitution.

Chapter 9 bankruptcy, unlike Chapter 7, discharges all debts from the time that a plan is confirmed, not the date the petition is filed: 11 U.S.C. § 944(b)(1) "the debtor is discharged from all debts as of the time when . . . the plan is confirmed".     In Chapter 7, the debtor is discharged from debts existing at the time of filing.  Post-filing debts are not discharged.  11 U.S.C. § 727(b).

This is important in the current case.  The time between the filing of a petition and confirmation in Chapter 9 cases is long.  In this case, the City filed in August, 2012, over three years ago.  We have a year to go before confirmation of the plan.  In this case, the City used the period between filing and approval of the plan in a sinister and unprecedented way.  The City used the stay to enact an unconstitutional plan and then stated it could not be sued because of the stay.  This is not the effect that Congress intended for bankruptcy.

But there is more.  The City, in its plan, intends on discharging the claims from the searches.  This is the logic.  Discharges under Chapter 9 are not subject to the "exceptions" to discharge set forth in 11 U.S.C. § 523(a).  These exceptions prohibit individual debtors from discharging debt arising from "willful and malicious injury." 11 U.S.C. § 523(a); *Kawaauhau v. Geiger*, 523 U.S. 57, 63, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998).  Damages for civil rights violations have been found to meet the ambit of being willful and malicious and not dischargeable for individuals.  Claims of racial discrimination in housing, held not dischargeable. *Magana v. Moore Development Corp*. *(In re Moore*), 1 B.R. 52, 54 (Bankr. C.D. Cal. 1979) "[d]ischarge of debts arising from willful violations" of the civil rights laws would be "inconsistent with the intent of Congress," as those laws are specifically intended to eliminate the "'badges and incidents of slavery".   This case is apposite because the rights sought here arise under the Constitution.

But the City is not concerned with these cases because under Chapter 9 they are not "individuals" and the willful exception is not incorporated into Chapter 9 bankruptcy provisions.   11 U.S.C. §§ 523(a) applies discharge exceptions to

"individual" debtors under sections 727, 1141, 1228(a), 1228(b), or 1328(b); 901 does not include the willful exception to discharge.  Chapter 9 bankruptcy filings are always municipalities and never individuals.  11 U.S.C. § 109(c)(1) ("[a]n entity may be a debtor under Chapter 9 of this title if and only if such entity ... is a municipality").

Courts have applied the exclusion of the willful exception to discharge to corporate debtors in the Chapter 11 context.  *In re Pacific-Atlantic Trading Co*., 64 F.3d 1292, 1302 (9th Cir. 1995).

The statutory scheme would seem to create a loophole for the City.  It can violate citizens' rights after filing for bankruptcy and before confirmation of the plan with impunity.  No one can challenge the City due to the stay under 11 U.S.C. § 362 and if any claims are incurred those too can be discharged.

The legislative history to Chapter 9 discharge and stay provisions is equally unavailing.  The record is largely silent.  No provision could be found by counsel after diligent search, that a municipality could intentionally use the stay provisions of 11 U.S.C. §362 and the discharge provisions of Chapter 9 to avoid suit or liability for an unconstitutional policy.  H.R. Rpt. No. 94-686 (1975), reprinted in 1976 U.S.C.C.A.N. 539; H.R. Conf. Rpt. 94-938 (1976), reprinted in 1976 U.S.C.C.A.N. 583; H.R. Rpt. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963; S. Rpt. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787.  This is probably because Congress never anticipated that a municipality would intentionally violate civil rights and then attempt to use federal law to avoid

consequence.   Briefly put, the concept of national, constitutional rights being defeated by misuse of bankruptcy law did not appear to occur to anyone.

**2. BANKRUPTCY LAW WAS NOT ENACTED TO PROTECT ROGUE MUNICIPALITIES**

The purpose of Chapter 9 bankruptcy is to allow a financially distressed municipality to reorganize its affairs.  The stay is an integral part of that reorganization.  The stay is not without limits.  Certain provisions of the *Code* illustrate this.

**3. SECTION 109 (c)(4) DOES NOT GRANT PROTECTION FOR DEBTORS WHO USE A FILING FOR REASONS OTHER THAN REORGANIZATION**

To be eligible to have the protection of Chapter 9, a municipality must be a debtor who wishes to reorganize its debts.

An entity may be a debtor under chapter 9 of this title [11 U.S.C. §§ 901 et seq.] if and only if such entity . . . desires to effect a plan to adjust such debts."

A debtor who wishes to reduce its debts does not intentionally incur more debts through an unconstitutional scheme.  Once the City ceased trying to reorganize  its debts and sought to be an oppressor, it removed itself from eligibility for Chapter 9 protection because it was not using the bankruptcy filing to reorganize, but for a more sinister reason.  Congress in enacting 109(c)(4) intended to place specific limits on when a municipality can employ Chapter 9 protection.  Only debtors wishing to reorganize are allowed its protections.

Appellants' position is that a debtor who uses the protection of the bankruptcy laws to shield an unconstitutional program loses protection of those laws for those acts.

**4. 11 U.S.C. § 921(c) PROHIBITS BAD FAITH FILING**

The language of 11 U.S.C. § 921 contains a gatekeeping provision that a bankruptcy that is filed in bad faith may be dismissed.

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.  11 U.S.C. §921(c) (Proviso that a court may dismiss a chapter 9 petition if the debtor did not file the petition in good faith.)

A Bankruptcy Court reviewing the good faith provisions of 11 U.S.C. § 921 came to this conclusion:

> Section 921(c)'s 'good faith' provision serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code.  It is assessed on a case-by-case basis in light of all the facts, which must be balanced against the broad remedial purpose of chapter 9.  *In re City of Stockton*, 493 B.R. 772, 794, quoting 2 Collier on Bankruptcy ¶ 921.04[2]. (Henry J. Sommer & Alan N. Resnick eds. 16th ed. 2011.)

The statute, and court interpretation, recognizes that there is a good faith requirement to be protected by the bankruptcy laws.  A debtor cannot use those laws to defeat civil rights.

## 5. FAIRNESS PROVISION OF BANKRUPTCY CODE §1129(a)(3)

Section 1129(a)(3) of the Bankruptcy Code, as made applicable by section 901(a) of the Bankruptcy Code, requires a municipal debtor to propose a discharge plan that "has been proposed in good faith."  Good faith requires, at a minimum, that the plan "treat all interested parties fairly and that the efforts used to confirm the plan must comport with due process."  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999).

Good faith is a bedrock principle of Chapter 9 filings.  *See American United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 144-46 (1940) (reversing order of confirmation for, among other reasons, lack of good faith); *Kaufman County Levee Imp. Dist. No. 4 v. Mitchell*, 116 F.2d 959, 960 (5th Cir.1941) (affirming denial of confirmation where "the plan was unfair and discriminated in favor of the bondholders owning lands and against those who did not"); *Town of Belleair v. Groves*, 132 F.2d 542, 543 (5th Cir. 1942) (affirming denial of confirmation and dismissal of case on bad faith grounds where the proposed plan did not "embod[y] a fair and equitable bargain openly arrived at and devoid of overreaching").

The notion of elemental fairness is found in more recent decisions where plans were rejected by courts due to a lack of fairness. *See, e.g., Ault v. Emblem Corp. (In re Wolf Creek Valley Metro. Dist. No. IV)*, 138 B.R. 610, 618-19 (D.

Colo. 1992) (reversing confirmation order on grounds that proposed plan singled out one landowner to be burdened by plan); *In re Pierce County Hous. Auth.*, 414 B.R. 702, 719-720. (Bankr. W.D. Wash. 2009 (denying confirmation due to lack of good faith where the proposed plan would have limited creditor recoveries from other sources and hence "does not indicate a sincere attempt by the Debtor to readjust its debts by maximizing the creditors' recovery").

"A plan proposed in good faith is defined as one that satisfies the purposes of the bankruptcy code." *Sec. Farms v. Gen. Teamsters, Warehousemen & Helpers Union, Local 890* (*In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890*), 265 F.3d 869, 877 (9th Cir. 2001) *citing Ryan v. Loui* (*In re Corey*), 892 F.2d 829, 835 (9th Cir. 1989).

While not directly relevant to the issue of whether the stay applies to intentional post-petition civil rights violations by municipal debtors,  § 1129(a)(3) of the Bankruptcy Code, is an indicia that Congress never intended bankruptcy law to produce unjust results, much less to be used as an engine by a municipal debtor in bankruptcy to achieve the goal of defeating citizens' civil rights.  Good faith is a fundamental element of the Bankruptcy Code.  The actions of the City were not in good faith and should not be protected by the stay.

## 6. *READING* ANALYSIS

In *Reading v. Brown*, 391 U.S. 471 (1968); 88 S. Ct. 1759; 20 L. Ed. 2d 751, the Supreme Court faced a similar situation to the current case.  In the Chapter 11 context the question was presented about what priority did debts incurred by the negligent act of a receiver have in the bankruptcy plan?  No explicit statutory provision existed to cover the situation.  The Supreme Court answered that the debts should have priority as necessary expenses.  The reasoning was that because people who dealt with the debtor post-petition had the bankrupt business thrust upon them that those people should have highest priority.  "Hence the present petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law" *Id.* at 478.  In essence, those who dealt with the City had the debtor thrust upon them.  That they should lose civil rights because of the City's bankruptcy would violate the rule of fairness in bankruptcy.  "But it would be inconsistent both with the principle of *respondeat superior* and with the rule of fairness in bankruptcy . . ." *Id.* at 479, in explaining its ruling.

The analogy here is that the citizens had a bankrupt San Bernardino thrust upon them.  An intentional tort committed by the City harmed them.  While *Reading* deals with debt priority, the analysis is the same.  Citizens harmed post-petition by a municipality in Chapter 9 should not be prevented from pursuing their claims by the stay.  The outcome would create municipalities free from all restraint.  As Judge Meredith A. Jury accurately said ". . . what has been alleged probably shouldn't be protected by the stay in bankruptcy."  ER 378:12-13.

In *Reading,* the Court decided it would craft an exception to the priority of debtors based on the premise that statutes are designed to promote fairness. Congress would never intend to work an intentional harm upon its citizens. The construction urged upon the Court by the City is this: "We can violate citizens' rights and the citizens cannot challenge us in court because we have a stay." How long would it have taken Eugene Connor to trot to bankruptcy court when Martin Luther King appeared in Birmingham, if such an option was open to him? It is troubling that the City, crassly, is using the law to defeat civil rights. Fairness dictates such an outcome cannot stand.

Appellants assert that the actions of the City were not protected by either 11 U.S.C. § 362 or § 922.

## II.   THE STAY PROVISION DOES NOT APPLY TO DECLARATORY AND INJUNCTIVE RIGHTS UNDER 28 U.S.C. § 2201

The Bankruptcy Court stayed the claims for injunctive and declaratory relief on the reasoning that to allow those claims to proceed would cost the City defense costs and, hence, take City property in violation of 11 U.S.C. § 362(a)(3).

The provisions of 28 U.S.C. § 2201 give citizens a right to pursue declaratory and injunctive relief as necessary, prior to an injury. It serves vital public policy goals of reducing costs, declaring rights of parties and preventing injury. The law has been invaluable in vindicating civil rights.

The stay as construed destroys that right. Nothing in the stay provisions of 11 U.S.C. § 362 indicates that Congress intended for this effect. Nothing in the legislative history indicates Congressional intent was for the stay to vitiate rights

under 28 U.S.C. § 2201.  Appellants assert that absent a showing that Congress intended to vitiate 28 U.S.C. § 2201, it was never the goal of Congress to have the stay forestall the right to injunctive and declaratory relief.

## A. COMPLAINTS FOR INJUNCTIVE RELIEF DO NOT VIOLATE THE STAY PROVISIONS

Related to Appellants' argument that the automatic stay provisions of 11 U.S.C. § 362 do not apply to injunctive relief is *AAA v. Oakhurst Lodge*, 2012 U.S. Dist. LEXIS 179753.  In that case, the Court ruled that filing for injunctive relief in an intellectual property case did not violate the stay.  The reasoning was that if the stay provisions prevented a copyright holder from seeking relief while the interloper was in bankruptcy then interlopers would be allowed to run amok.  This would make copyright protection a mockery.  The same holds true here – if the stay prevents the Appellants from a declaration that the scheme was unconstitutional and an injunction preventing the City from invading their homes again, then the protections of 22 U.S.C. § 2201 become hollow.

## B. THE AUTOMATIC STAY PROVISIONS DO NOT APPLY TO AWARDS FOR ATTORNEY'S FEES UNDER 42 U.S.C. § 1988

In Bankruptcy Court, the Appellants argued that the stay did not prohibit the causes of action for declaratory and injunctive relief from proceeding, even if it prohibited all other causes of actions from proceeding.  The Appellee has argued in the past that because the Appellants sought attorneys' fees under 28 U.S.C. § 1988, all causes should be prohibited from proceeding.  The Bankruptcy Court held the stay prevented the suit from proceeding and ordered dismissal.  The reasoning was

that any action that proceeded would cause the City to incur defense costs and therefore take property of the debtor.

Appellants assert this order was error in that the cause of action under 28 U.S.C. § 2201 should proceed because it does not seek property, but instead seeks a court order as argued above.  Equally, attorney's fee provisions under § 1988 are not an attempt to procure the debtor's property but are a cost that a debtor municipality incurs intentionally and are in no way an attempt to procure debtor's property by process.  Rather, the debtor willingly surrenders those fees as a cost of running itself in an unconstitutional fashion.

The language of the statute is an appropriate departure point.  11 U.S.C. § 362 (a)(1) states:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> (2)   the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
> (3)   any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

The language of the statute is sweeping but it is not annihilating.  It prohibits actions that seek to recover "claims" or "property" of the estate.  Declaratory and injunctive relief seeks neither.

The language of the statute providing for attorney's fees awards in civil rights cases is equally illustrative.  42 U.S.C. § 1988 (b):

> In any action or proceeding to enforce a provision . . . [specified Civil Rights Actions] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the **costs**. [Emphasis Added]

The use of the word "costs" by Congress was not accidental.   The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting H.R.Rep. No. 94-1558, p. 1 (1976).  This is done by shifting attorney's fees from the plaintiff whose rights are violated, to the person or entity that violated the rights as a cost.  Literally, the violator bears the costs of his conduct.

Municipalities are allowed to incur debts during the pendency of their bankruptcy. 11 U.S.C. § 904.   In fact, the Bankruptcy Code in the case of special revenue bonds subordinates the claims of the bond holders to "necessary operating expenses" of the Debtor.  11 U.S.C. § 928(b).  Clearly, if the costs under § 1988 are a product of a willful policy of a Debtor those costs become necessary expenses and subject to payment.  Interference of the Court in the political processes of the City cannot prohibit an order under § 1988 to pay costs of a civil rights violation by the City because 11 U.S.C. § 904 (1) only prohibits bankruptcy judges from interfering with "any of the political or governmental powers of the

debtor".  Violating civil rights never falls under the governmental powers of a debtor City.

For this reason, the stay should be lifted at minimum for the declaratory and injunctive causes of action together with attorney's fees under § 1988.

### III.   APPLICATION OF THE STAY VIOLATES THE FIRST AMENDMENT RIGHTS OF THE APPELLANTS

Appellants possess a First Amendment right to petition the government.  It is a fundamental right. "The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482, 105 S. Ct. 2787, 86 L. Ed. 2d 384 (1985).

The policy the City had, and has, and maintains was correct, is a direct violation of the Fourth Amendment rights of citizens, and apartment dwellers in the City of San Bernardino.  Access to the Courts to remedy that problem is guaranteed by the First Amendment and other provisions of law.  The stay prevents access to the Courts where the City has a policy in place and maintains its legality.

Succinctly, if the Appellants cannot even receive injunctive or declaratory relief in a court because of the stay, their First Amendment rights are destroyed.  The policy can go on unchallenged.

Should the Court rule that the automatic stay provisions protect the actions of the City from suit on all causes of action, then those provisions (11 U.S.C. §362 and 922) are an unconstitutional breach of the First Amendment right of Appellants to petition the government.  Appellants have notified the Attorney

General that this appeal calls into question the constitutionality of a United States

Statute and requested action under Federal Rule of Civil Procedure 5.1.

## IV.   THE COURT ERRED IN WEIGHING THE CURTIS FACTORS

The Court applied the *Curtis* factors to determine that those factors weighed

in favor of the Debtor.   Appellants respectfully disagree on the basis that their

rights to seek redress from an unconstitutional scheme, particularly when the City

maintains the correctness of the scheme, outweighs all effects that the lifting of the

stay would have on the City's bankruptcy.   The pragmatic concern that the City

may be harmed in its bankruptcy by being forced to defend its unconstitutional

scheme cannot justify the violation of citizens' rights, systemically, intentionally,

and on live television.

## A. THE *CURTIS* FACTORS

Twelve factors exist to determine cause –the "Curtis factors".   *In re*

*Landmark Fence Co., 2011* U.S.   Dist. LEXIS 150928, 10 (C.D. Cal. 2011).

> The most important factor in determining whether to grant relief from the
> automatic stay to permit litigation against the debtor in another forum is the
> effect of such litigation on the administration of the estate.   Even slight
> interference with the administration may be enough to preclude relief in the
> absence of a commensurate benefit.   *Landmark*, 2011 U.S. Dist. LEXIS
> 150928, pp. 9-10 (internal citations omitted).

The *Landmark* court listed these factors as follows: (1) whether the relief

will result in a partial or complete resolution of the issues; (2) the lack of any

connection with or interference with the bankruptcy case; (3) whether the foreign

proceeding involves the debtor as a fiduciary; (4) whether a specialized

tribunal has been established to hear the particular case; (5) whether the debtor's insurance carrier has assumed responsibility for defending the litigation; (6) whether the action essentially involves third parties; (7) whether the litigation in another forum would prejudice the interests of other creditors, (8) whether the judgment claim arising from the foreign action is subject to equitable subordination; (9) whether movant's success in the foreign proceeding would result in a judicial lien . . .; (10) the interests of judicial economy and the expeditious and economical determination of litigation for the parties; (11) whether the foreign proceedings have progressed to the point where the parties are prepared for trial, and (12) the impact of the stay and the "balance of hurt." *In re Landmark*, 2011 U.S. Dist. LEXIS 150928, 8-9 (C.D. Cal. Dec. 9, 2011) citing *Curtis*, 40 B.R. at 799-800; *See In re Plumberex Specialty Prods., Inc*., 311 B.R. 551, 559 (Bankr. C.D. Cal. 2004) (adopting *Curtis* factors).

The question then becomes whose interests prevail – the City in maintaining an unconstitutional policy, or the Appellants in being free from unreasonable searches and seizures?

## B. THE NATURE OF APPELLANTS' INTEREST

Appellants have argued extensively about the outrage they feel in having their homes invaded. Fourth Amendment protection of the home is sacrosanct.

Even aside from the substantial intrusion the mere presence of the police in Appellants' homes presents, in this case their homes were photographed, on a no-notice inspection warrant and photographs of their homes were posted on the internet, in newspapers and on television—all without consent. The intrusion is

more than a violation of privacy—it is a recordation of data that others may use to know the most intimate details of Appellants' lives.  Viewing their home revealed the politics and political activities of the Appellants as displayed in posters, books, pamphlets, and other materials; Appellants' reading habits, including books, newspapers, and magazine subscriptions; Appellants' movie-viewing habits, whether political, literary, or sexual[3]; Protected-class information, including race, national origin, creed, or sexual preference; Appellants' religious (or nonreligious) beliefs, affiliations, and practices, which may be unpopular or a subject of discrimination in the area; Appellants' familial and other intimate and non-intimate relationships, as well as the sex and identity of other occupants, as revealed in photographs and other personal effects; Personal habits, such as slovenliness – this is particularly true where the Chief of Police's Facebook post referred to the Appellants as slobs; Personal belongings, including jewelry, artwork, and furnishings, and children's possessions; Hobbies and interests, from the ordinary to what some may find disturbing; intimate preferences, practices, and characteristics, whether lawful or unlawful, which may conflict with the occupants' stated religious faith or otherwise open them to ridicule in their community; Private and possibly embarrassing personal and sexual habits; Lawfully or unlawfully possessed weapons; Embarrassing medications and devices; Tobacco, alcohol, or other substances whose use society frowns upon; Evidence that may be

---

[3]  Video Privacy Protection Act of 1988, 18 U.S.C. § 2710 prevents movie rental companies from disclosing who their customers are and what they watch.  This was enacted against the backdrop of Judge Bork's unfortunate experience of having his video rental history revealed to the world during his confirmation process.

incriminating; Memberships in groups and associations, i.e., membership in Alcoholics or Narcotics Anonymous.

The pervasive voyeurs' "peep" into an entire complex was disgusting. But it was far more corrosive. It was an injustice worked upon a disadvantaged class – renters. It was an injustice that allowed the City to collect a mosaic of information on Appellants. In *United States v. Jones*, 132 S. Ct. 945 (2012), the Court struck the practice of GPS monitoring of persons without a warrant, noting: "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." The practice was objectionable because "making available . . . such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to [inspect]—may 'alter the relationship between citizen and government in a way that is inimical to democratic society.'" *Id.* at 956 (quotation omitted).

That is what happened in San Bernardino, the relationship between citizen and government was altered in a fundamental way that was ". . . inimical to democratic society." *Id*.

### C. THE NATURE OF THE CITY'S INTEREST

Appellants do not argue there are no factors in *Curtis* that logically weigh in favor of the City. Instead, the argument is that those logical factors can never outweigh the violation of rights.

## D. THE INTEREST OF THE APPELLANTS IN LIVING FREE FROM OPPRESSION OUTWEIGHS ANY OF THE CITY'S INTERESTS

A City cannot go bankrupt on its citizens' rights.  No pragmatic bankruptcy concerns can justify the City's conduct.  The Appellants argue that as a matter of law the court below misapplied the *Curtis* factors and the stay should be lifted.

## V.    CONCLUSION

If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place, oblige it to control itself.  James Madison, Federalist No. 51, February 8, 1788.

That is the problem that has been thrust on the Appellants – how can they oblige the City to control itself?  A collision of rights has occurred.  Fairness dictates that the rule of fairness in bankruptcy not be abrogated and the stay lifted.

Dated: September 30, 2015                LAW OFFICES OF MARJORIE BARRIOS

                                         /s/ *Marjorie Barrios*
                                         Marjorie Barrios
                                         Counsel for Plaintiffs/Appellants

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>7,746</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013, in Times New Roman, 14 point font.

Dated: September 30, 2015          LAW OFFICES OF MARJORIE BARRIOS

<u>/s/ *Marjorie Barrios*</u>
Marjorie Barrios
Counsel for Plaintiffs/Appellants

**STATEMENT OF RELATED CASES**

There following cases are related to this case as they arise from the same set of facts: *Newberry et al v. County of San Bernardino*, EDCV, 14-02298 JGB (SPx).

Dated: September 30, 2015          LAW OFFICES OF MARJORIE BARRIOS

<u>/s/ *Marjorie Barrios*</u>
Marjorie Barrios
Counsel for Plaintiffs/Appellants